# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

**United States of America**

    *Plaintiff*,

v.                                                               Case No. 3:18-cr-087
                                                                                Judge Thomas M. Rose

**Uriel Betancourt,**

    *Defendant*.

---

**ENTRY AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS.** (ECF 23).

---

Pending before the Court is a motion to suppress filed by Defendant Uriel Betancourt. ECF 23. The motion requests an order suppressing evidence seized from a red Chevy pickup truck and statements made subsequent to his arrest. Betancort contends that the search of the truck's transmission was unconstitutional and that the fruits of that search, including narcotics seized and statements made, should be suppressed.

**Background**

On June 7, 2018, Sgt. Coverstone of the Ohio State Patrol was working on I-70 in Preble County. (Transcript of 4/11/19 hearing, R.30 at PageID 123). Coverstone noticed a red truck that was utterly unremarkable:

> What caught my attention about the vehicle was that it appeared to be going slower than other traffic in the area, as there was cars in the left lane passing it. As the vehicle got closer to me, I was able to see a male driver sitting very upright, rigid in his seat with both hands on the steering wheel at approximately the 10 and 2 o'clock

> position staring straight ahead with the lack of any common movement. ... He was very stiff, as far as no -- he wasn't, you know, one arm on the wheel looking around, drinking, doing anything. He was intently focused and staring straight ahead driving when he drove by me.

PageID 124-25. Coverstone "checked its speed with the laser [and registered] 68 miles an hour, which was two miles an hour [within] the speed limit." PageID 125-26.

Having no reason to follow the red truck, but constitutionally requiring none, Coverstone followed the truck and ran its license plate number, incorrectly leaving off the subscript ending letter used on some State of Illinois issued plates, and due to his own error, determined that the license plate was not issued to a red truck. Coverstone admits that based on these reasons, he determined to pull the truck over, but before doing so, noticed that the car was following the truck ahead of it too closely. The Court has reviewed the dashcam tape of the incident and has determined that the red truck was indeed failing to maintain a safe distance from the truck ahead of it.

Coverstone approached the stopped truck and engaged in conversation with the lone male driver, later identified as Defendant Uriel Betancourt. (Id. at PageID 131- 132). Coverstone explained how the registration on the plate should have been on a Chevy van and asked for Betancourt's driver's license and registration. (Id.). While Betancourt was looking for the requested items, Coverstone asked questions regarding Betancourt's ownership of the vehicle and travel. (Id.). Betancourt provided a Texas driver's license and indicated that he was coming from Dallas and going to Columbus, which prompted questions regarding the vehicle's Illinois license plate. (Id. at PageID 131-133). Betancourt was able to provide an insurance card in the name of Gonzalo Betancourt, which listed Uriel Betancourt as additional driver. (Id. at PageID 134). After

a couple minutes of looking and Betancourt being unable to locate registration paperwork, Coverstone observed what appeared to be registration paperwork and asked to look at that it. (Id.). However, the registration that Coverstone had noticed was an expired one for an individual from Las Vegas, Nevada. (Id.).

Coverstone then halted Betancourt's search for his registration and ordered him to his cruiser. (Id., Transcript of 4/11/19 hearing R.31 at PageID 157-158). Coverstone made this decision because he was unable to verify ownership of the vehicle and the tag had not come back, and he believed it was safer to review the paperwork from the patrol car in order to prevent any pursuit should the vehicle information come back stolen. (R. 31 at PageID 158). Nevertheless, the Court notes that Coverstone theoretically had the ability to check the VIN through other avenues. (R.31 at PageID 205). At approximately 10:38 am, Coverstone contacted Trooper Wheeland to request a K-9. (Id. at PageID 135).

Coverstone perceived Betancourt as nervous (Id. at PageID 134), Betancourt's hands as shaking excessively (Id. at PageID 131), and his speech as changing patterns upon being questioned about the family he was travelling to see (Id. at PageID 135). Before Coverstone had Betancourt enter the cruiser, Coverstone conducted a pat-down for weapons. (Id. at PageID 136). During the pat-down, Coverstone claims to have noted that Betancourt's heart was beating very quickly, which prompted Coverstone to inquire if Betancourt was feeling alright or taking medications. (Id. at PageID 136, 138).

While in the cruiser, Coverstone discussed with Betancourt that the license plate was coming back to another vehicle and showed Betancourt the computer screen. (R. 30 at PageID

137-138). After nine minutes, at approximately 10:47 a.m., Coverstone confirmed with dispatch that Betancourt's license was valid and that he had no criminal history. (R. 30 at PageID 139-141).

A minute earlier, at 10:46 a.m., Wheeland had arrived and Coverstone signaled to have Wheeland's K-9 walk the truck. (R. 30 at PageID 140). Wheeland walked his narcotics detection K-9, around the vehicle with the command to find. (R. 30 at PageID 82-83). The dog alerted at the lower door seam. (R. 30 at PageID 85). That alert occurred at 10:48 am, approximately 12 minutes after the traffic stop occurred. (R. 30 at PageID 141). At that time, Coverstone had not yet resolved the registration issue and thus had not gotten to the point of writing a ticket for the traffic violation. (R. 30 at PageID 140-142). Additionally, Coverstone had not run the VIN of the vehicle to determine if he could resolve the registration. (R. 31 at PageID 160).

As part of his investigation, Coverstone contacted the El Paso Intelligence Center and obtained information about border crossings. (R. 30 at PageID 142). Consequently, Coverstone learned that Betancourt and his vehicle had crossed the border two days prior at the Presidio checkpoint. (R. 31 at PageID 162). Coverstone verified that the Presidio checkpoint was approximately 8 1/2 hours away from Dallas, from where Betancourt indicated he had travelled. (Id.).

After securing his dog, Wheeland pulled Betancourt's vehicle further off the side of the highway for officer safety before he followed up on this dog's alert with a search of the of the vehicle. (R. 30 at PageID 85-90). When Wheeland's check found nothing, Coverstone decided that he wanted the vehicle to be taken to a private garage called "Fudge's" for a more in-depth search. (R. 30 at PageID 88). Knowing of the recent border crossing and the K-9 alert, Coverstone

4

believed that there might be a deep difficult-to-detect concealment which would require tools to discover. (R. 31 at PageID 163-165).

It was then and that Coverstone informed Betancourt of his *Miranda* rights. *Id.* Betancourt's truck was taken at 11:29 a.m. to Fudge's Garage. RT at 150: 24. The Government asserts that using a private garage when conducting in-depth searches allows officers a safer environment, mechanics who can assist and tools including lifts to permit searches underneath vehicles. (R. 30 at PageID 90).

After the dog alerted and Coverstone learned of the recent border crossing, Coverstone obtained a Spanish version *Miranda* form to go over with Betancourt. (R. 31 at PageID 165). Coverstone had Betancourt read the Spanish version out loud to ensure Betancourt's comprehension. (R. 31 at PageID 166). After doing so, Betancourt signed the *Miranda* form. (R. 31 at PageID 167, Gov't Exhibit 5). During this interaction, Coverstone utilized Google Translate to assist in making sure Betancourt understood. (R. 31 at PageID 168).

After obtaining Betancourt's *Miranda* waiver. Coverstone discussed the issues with Betancourt's vehicle not matching the plate with Wheeland. (R. 31 at PageID 169). Before the truck was taken to Fudge's, Coverstone talked to Wheeland who informed Coverstone how to place a query of an Illinois truck license plate in the system; Coverstone added the letter"B" to the numeric characters –as depicted in the license plate-- and the database came back with the correct description of the truck, a 2003 Dodge Ram registered to Betancourt's brother's name. RT at 160: 11-25 and 161: 1-5. After learning this, Coverstone spoke with Betancourt again but terminated the questions when Betancourt advised he did not want to answer a specific question. (R. 31 at PageID 170).

At Fudge's, an in-depth search revealed suspected heroin hidden in the tail shaft housing of the transmission. (R. 31 at PageID 173-178). Coverstone and the mechanics there "Pulled the vehicle in onto the lifts at Fudge's." Coverstone saw tampering in the oil pan and transmission area. He said he "went ahead and raised it up immediately to look underneath of it. [He] immediately noticed that there was some tampering around the oil pan area, along with the transmission bolts. They showed signs of recent removal. So, obviously, I knew this was going to take some time to disassemble,…" RT at 110: 1-10. Coverstone searched the truck inside and found no contraband. RT at 154: 5-12. Then "He] went ahead and disassembled the transmission area due to the fresh disturbance on the bolts. Took the transmission apart, dropped it down with the linkage." RT at 7 111: 8-11. After dismantling the transmission, Coverstone found contraband located inside of the tail shaft housing unit at the end of the transmission. RT at 111: 8-25. Subsequently, more contraband was found inside the rear axle as well. RT at 120: 2-9. The transmission was dismantled at around 1:00 p.m. almost 2 1/2 hours after the initial stop. RT at 155: 18-24; 156: 20-21. Coverstone never requested a warrant even when the truck was in a secured area and the defendant was in the back of his patrol car.

After discovering this, Coverstone contacted Homeland Security. (Id. at PageID 178-179). Coverstone then showed Betancourt a package of narcotics, told him it was drugs, and placed Betancourt under arrest. (Id. at PageID 179-181).

Law enforcement continued to search Betancourt's vehicle, with the assistance of mechanics, and discovered additional suspected heroin in the rear axle. (R. 31 at PageID 181- 190). As Coverstone sat in his patrol car working on his report, Betancourt initiated a conversation asking Coverstone, "Is it bad?" (Id.). Coverstone went over Betancourt's previous termination of

6

questions and advised Betancourt that he could not speak with Betancourt again unless Betancourt wanted to waive his rights and put his waiver in writing. (R. 31 at PageID 191). Coverstone then showed Betancourt the same *Miranda* form previously used and had Betancourt sign again below a paragraph indicating Betancourt's intent to reopen question. (R. 31 at PageID 191-192, Gov't Exhibit 5). After Betancourt signed the *Miranda* waiver form again, he was interviewed by Agent Walters and admitted to his involvement in the transportation of narcotics explaining, among other things, his payment, his destination and where he obtained the vehicle loaded with narcotics. (R. 31 at PageID 192-193).

**Analysis**

A warrantless search of a vehicle is permitted only when law enforcement officers have probable cause to believe the vehicle contains contraband. *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996); *Maryland v. Dyson*, 527 U.S. 465, 466 (1999). Probable cause exists when facts and circumstances within the officer's knowledge are sufficient to support a reasonable belief that a crime has been or is being committed by the person arrested. *Illinois v. Gates*, 462 U.S. 213 (1983). Even if probable cause is established, the scope of the search "must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible." *Terry v. Ohio*, 392 U.S. 1, *19 (1968) (citing *Warden v. Hayden*, 387 U.S. 294, 310 (1967)).

Here, the troopers based probable cause for the warrantless search on a dog sniff, Defendant's claim that he was travelling from Dallas, when the vehicle had crossed the Mexican border two days before, and Defendant's demeanor.

Defendant argues that the search of Betancourt's truck cannot be justified as a result of the canine search. Defendant perceives an initial search that produced no contraband and believes the successful search occurred after he was illegally detained.

Under the exclusionary rule, suppression of evidence is the proper remedy for violations of the Fourth Amendment. *United States v. Leon*, 486 U.S. 897 (1984). The "fruit of the poisonous tree" doctrine precludes not only the admissibility of evidence which is the direct result of Fourth Amendment violations, but also any evidence obtained by an exploitation of that violation. *Wong Sun v. United States*, 371 U.S. 471 (1963). Therefore, any evidence obtained as a result of an officers' unconstitutional actions, and its fruits, must be suppressed. *Id.*

Defendant seeks to suppress all property and contraband seized by the arresting officers, all observations made by the arresting officers, and all statements made by the Defendant. "The Fourth Amendment forbids law enforcement officers from making unreasonable searches and seizures, 'and its protections extend to brief investigatory stops of . . . vehicles that fall short of traditional arrest.'" *United States v. Luqman*, 522 F.3d 613, 616 (6th Cir. 2008) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

Because a traffic stop is a seizure under the Fourth Amendment, police may not initiate a stop for any conceivable reason. Rather, they must possess at least reasonable suspicion that a traffic law has been violated or that other criminal activity is taking place. *Gaddis ex rel. Gaddis v. Redford Twp.*, 364 F.3d 763, 771 n.6 (6th Cir. 2004). Furthermore, the degree of the stop must be reasonably related to the situation at hand. *United States v. Davis*, 430 F.3d 345, 353-54 (6th Cir. 2005). Any detention that is unreasonably prolonged is unlawful. *United States v. Sharpe*, 470 U.S. 675 (1985). Once a traffic stop is made, the detention "must be temporary and last no

longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500 (1983).

Here, Coverstone stated that Betancourt was "following too close." The dash cam video from the patrol car confirms this. "[S]o long as the officer has probable cause to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful and does not violate the Fourth Amendment." *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir.1993); see also *Whren v. United States*, 517 U.S. 806, 810 (1996).[1]

During a traffic stop, an officer may request a driver's license and registration and run computer checks on them without exceeding the scope of a traffic stop. *United States v. Bonilla*, 357 Fed. App'x 693, 696 (6th Cir. 2009). Coverstone requested Betancourt's registration paperwork, which Betancourt was unable to find in the time permitted to him. While Betancourt was searching through his papers in the truck, Coverstone asked questions about Betancourt's travel. An officer may ask questions unrelated to the traffic stop, provided that doing so does not unreasonably extend the traffic stop beyond the reasons for the traffic stop. *United States v. Everett*, 601 F.3d 484, 492 (6th Cir. 2010) (citations omitted); see also, *United States v. Bell*, 555 F.3d 535, 541 (6th Cir. 2009) ("An officer's inquiries into matters unrelated to the justification for the traffic stop … do not convert the encounter into something other than a lawful seizure, so long as those

---

1 Because Defendant was failing to maintain a safe distance, the Court is not presented with a question of whether Defendant could have been pulled over based solely on officer error. See *Herring v. United States*, 555 U.S. 135, 144 (2009) ("To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system. As laid out in our cases, the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence.").

inquiries do not measurably extend the duration of the stop."). At this time, Coverstone's questions occurred while Betancourt was looking through papers to find his registration and did not impact the duration of the stop.

Despite Betancourt's attempts to find his registration paperwork, he was unable to do so, prompting Coverstone to have Betancourt sit in his cruiser so that they could continue investigating the registration from the controlled setting of the patrol vehicle. In a traffic stop, "an officer can lawfully detain the driver of a vehicle until after the officer has finished making record radio checks and issuing a citation, because this activity 'would be well within the bounds of the initial stop.'" *United States v. Wellman*, 185 F.3d 651, 656 (6th Cir.1999) (quoting *United States v. Bradshaw*, 102 F.3d 204, 212 (6th Cir. 1996)).

Coverstone's decision to ask Betancourt to leave his vehicle and sit in his while the registration investigation continued was not unreasonable. Officers may order a driver out of a vehicle during a traffic stop. *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977). Furthermore, officers may ask a driver to sit in a cruiser during the completion of the traffic investigation and citation process. *United States v. Shank*, 543 F.3d 309, 314 (6th Cir. 2008); *Wellman*, 185 F.3d at 656.

Besides, the more time Coverstone spent with Betancourt, the more suspicions he had that Betancourt was involved in something more serious than an expired registration. (R.31 at PageID 207). While trying to resolve the registration issue, Wheeland arrived and his K-9 alerted on Betancourt's vehicle. There was no delay in the traffic stop to obtain the K-9 alert; Coverstone had radioed for assistance while waiting on Betancourt to locate his registration paperwork. It

was after the dog alerted on the vehicle that Wheeland suggested another manner of running the license plate, which resolved the outstanding registration issue.

"Once the purpose of the traffic stop is completed, a motorist cannot be further detained unless something that occurred during the stop caused the officer to have a reasonable and articulable suspicion that criminal activity was afoot." *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999) (citing *United States v. Erwin*, 155 F.3d 818, 822 (6th Cir. 1998); *United States v. Mesa*, 62 F.3d 159, 162 (6th Cir. 1995)). Despite resolving the purpose for the traffic stop, the dog's alert on the vehicle now gave officers probable cause to search the vehicle. An alert by a trained narcotic detection dog can establish probable cause for the presence of controlled substances. *United States v. Diaz*, 25 F.3d 392, 394 (6th Cir. 1994). Wheeland testified his dog met the criteria and qualifications of a being a narcotic-detection dog. (R.30 at PageID 69-75). The dog's alert also caused officers, who were already suspicious of Betancourt's behavior and his statements concerning travel from Dallas, and who were aware that the vehicle had actually been in Mexico two days previous to have reasonable and articulable suspicion that Betancourt was involved in criminal activity and to be justified in further detaining him.

After the dog alert, officers had probable cause to search Betancourt's vehicle and all places where drugs could be concealed. "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *United States v. Ross*, 456 U.S. 798, 825 (1982). Due to the recent border crossing and Coverstone's awareness of how cartels conceal narcotics using locations in a vehicle that would not be easy to get to, coupled with Betancourt's contradictory statements about his travel omitting recent border crossings, Coverstone had reason to believe that the drugs were going

11

to be well concealed and that a search would require assistance from mechanics, special tools to conduct that search and a safe location to complete a search of Betancourt's truck.

Once at Fudge's, law enforcement noted fresh disturbances on the bolts around the transmission area. (R. 31 at PageID 173). Upon disassembling the transmission, there was a suspicious amount of silicone present, prompting law enforcement to remove the inner cylinder of the tail shaft housing. (Id.). Then law enforcement saw duct tape wrapped around a cylinder concealing vacuum-sealed packages of black tar heroin. (Id.). Thus, Coverstone's beliefs that there was a deep concealment were confirmed establishing further probable cause that additional narcotics were concealed within the truck. In addition to the location of the initial drugs and based on his training and experience, Coverstone did not believe that a trip involving a border crossing would only contain the one-half kilo of heroin that had been located. (R. 31 at PageID 181). Thus, law enforcement continued to search Betancourt's truck with the assistance of mechanics, resulting in the location of additional heroin in the rear axle. (R. 31 at PageID 181-182).

During the thorough search of Betancourt's vehicle and prior to the location of the heroin in the drive train compartment, Betancourt was detained within Coverstone's vehicle.[2] As

---

2 It is the duration of Betancourt's detainment which is at issue. A governmental "intrusion into a particular area, whether in an automobile or elsewhere, cannot result in a Fourth Amendment violation unless the area is one in which there is a 'constitutionally protected reasonable expectation of privacy.'" *United States v. Rascon-Ortiz*, 994 F.2d 749, 754 (10th Cir. 1993) (quoting *New York v. Class,* 475 U.S. 106, 112 (1986) (quoting *Katz v. United States,* 389 U.S. 347, 360 (1967) (Harlan, J., concurring))). Moreover, an individual has a lesser expectation of privacy in an automobile, than in a residence. *United States v. Rascon-Ortiz*, 994 F.2d 749, 754 (10th Cir. 1993) ("The undercarriage is part of the car's exterior, and as such, is not afforded a reasonable expectation of privacy.")

previously noted, law enforcement may detain an individual when they have reasonable and articulable suspicion that a crime was being committed. *Hill*, 195 F.3d at 264.

During the interactions with Betancourt on June 7, 2018, Betancourt was asked many questions over a period of time. The initial questions relevant to the traffic stop do not rise to the level of a custodial interrogation, which would have prompted the requirements of advising Betancourt of his rights under *Miranda*. *Berkemer v. McCarty*, 468 U.S. 420, 436 (1984); see also, *Everett*, 601 F.3d at 495. However, after the dog alert on Betancourt's truck, Coverstone advised Betancourt of his *Miranda* rights and did so in a manner to ensure full understanding: the use of a Spanish language *Miranda* waiver form, the use of Google Translate and having Betancourt read the rights out loud in Spanish. (R. 31 at PageID 166-168, Gov't Exhibit 5). Once Betancourt indicated he did not want to answer a question, Coverstone honored his request and terminated the questioning. (R. 31 at PageID 170).

Coverstone's next interaction with Betancourt occurred after the discovery of heroin when Coverstone formally placed Betancourt under arrest. (Id. at PageID 179-181). Later, when Coverstone was completing his report, Betancourt initiated conversation with Coverstone. (Id. at PageID 190-191). *Edwards v. Arizona*, 451 U.S. 477, 485 (1981) (accused's invocation of *Miranda* right does not preclude later interrogation when accused initiates further communication). After reinitiating conversation, Coverstone again went over the Spanish language *Miranda* rights form and had Betancourt sign the waiver again before resuming questioning. (R. 31 at PageID 190-192, Gov't Exhibit 5). It was after this second waiver of *Miranda* that Betancourt confessed to his role in trafficking narcotics

**Conclusion**

The detainment of Defendant while his car was searched was prolonged and the search extremely intrusive. However, because at the time of the traffic stop, law enforcement had probable cause to stop Betancourt's vehicle and after stopping the vehicle, law enforcement engaged in an ongoing investigation into a registration issue and caused no delay in requesting a K-9 to conduct a free air sniff of the vehicle and because during the investigation law enforcement developed additional suspicions that Betancourt was engaged in criminal behavior, including a K-9 alerting on the vehicle, based on the information obtained from Betancourt and the investigation, law enforcement had reasonable, articulable suspicion that Betancourt was involved in criminal activity justifying their detaining Betancourt while a search was conducted and completed the search of his vehicle. All of the information the police possessed was necessary to justify the scope of his detention. For this reason, Defendant's Motion to Suppress, ECF 23, is **DENIED.**

**DONE** and **ORDERED** in Dayton, Ohio, this Monday, July 8, 2019.

s/Thomas M. Rose
_____
THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE